Darrell P. White (SBN: 270038)
Michelle E. Soon (SBN: 329098)
Maxx E. Sharp (SBN: 334931)
**KIMURA LONDON & WHITE LLP**
3 Park Plaza, Suite 1520
Irvine, California 92614
(949) 474-0940
dwhite@klw-law.com
msoon@klw-law.com
msharp@klw-law.com

Attorneys for Plaintiffs,
BITECH TECHNOLOGIES CORPORATION

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| BITECH TECHNOLOGIES CORPORATION, a Delaware corporation;<br><br>Plaintiff,<br>v.<br><br>MICHAEL CAO, an individual; CALVIN CAO, an individual; SUPERGREEN ENERGY CORPORATION, a Nevada corporation; B & B INVESTMENT HOLDING, LLC, a Utah limited liability company; LINH DAO, an individual; and DOES 1 to 10,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br>1) **FRAUD- CONCEALMENT;**<br>2) **BREACH OF CONTRACT;**<br>3) **BREACH OF FIDUCIARY DUTY-DUTY OF GOOD FAITH;**<br>4) **BREACH OF FIDUCIARY DUTY-UNDIVIDED LOYALTY;**<br>5) **CONVERSION; AND**<br>6) **VIOLATION OF CALIFORNIA PENAL CODE §496;**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff BITECH TECHNOLOGIES CORPORATION alleges:

## THE PARTIES

1. Plaintiff BITECH TECHNOLOGIES CORPORATION, formerly known as Spine Injury Solutions, Inc., ("BITECH" or "Plaintiff") is, and at all times mentioned herein was, a corporation incorporated in the State of Delaware and headquartered in Newport Beach, California.

2. Defendant MICHAEL CAO ("M CAO" or "Defendant") is, and was at all times relevant, an individual residing in the State of Florida.

3. Defendant CALVIN CAO ("C CAO" or "Defendant") is, and was at all times relevant, an individual residing in the State of California.

4. SUPERGREEN ENERGY CORPORATION ("SUPERGREEN" or "Defendant") is, and was at all times relevant, a corporation incorporated and headquartered in the State of Nevada.

5. B & B INVESTMENT HOLDING, LLC ("B & B" or "Defendant") is, and was at all times relevant, a Utah limited liability company, headquartered in Florida.

6. Defendant LINH DAO ("DAO" or "Defendant") is, and was at all times relevant, an individual residing in the State of Florida.

## JURISDICTION AND VENUE

7. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises from a dispute arising under patent law and the licensing thereof. *See Gunn v. Minton*, 568 U.S. 251 (2013).

8. Venue is proper in this Court because the subject agreement provides that the parties to this case submit to the exclusive jurisdiction of a court of competent jurisdiction in Orange County, California and that the governing Law shall be with respect to US patent law and the State of California. Additionally, a substantial portion of the events and a substantial portion of the property at issue is situated in this district.

## GENERAL ALLEGATIONS

9. BITECH makes the following general allegations and alleges each of its causes of action in the alternative.

10. BITECH is a publicly traded company that focuses on providing a suite of electrical power generation technologies called the Evirontek Integrated Platform.

11. On March 31, 2022, BITECH acquired Bitech Mining Corporation ("Bitech Mining") pursuant to a Share Exchange Agreement (the "Share Exchange Agreement") whereby all of the shareholders of Bitech Mining exchanged their shares of Bitech Mining for

shares of BITECH's Series A Convertible Preferred Shares. The Series A Convertible Preferred Stock automatically converted into shares of BITECH Tech common stock on June 27, 2022 pursuant to the Certificate of Designations of Preferences and Rights of Series A Convertible Preferred Stock filed with the State of Delaware Secretary of State on March 23, 2022. While Bitech Mining is named in this complaint at times for purposes of clarity, BITECH shall encompass both Plaintiff BITECH TECHNOLOGIES CORPORATION and Bitech Mining Corporation, became a wholly owned subsidiary of BITECH TECHNOLOGIES CORPORATION pursuant to the Share Exchange Agreement. Indeed, any harm that Bitech Mining suffered in turn damaged BITECH and any claims that Bitech Mining Corporation has or had were acquired by BITECH when it acquired Bitech Mining.

12. M CAO represented himself to Bitech Mining as an expert in the industries of cryptocurrency mining and blockchain. Bitech Mining relied on M CAO's representations as to his expertise and in consideration of M CAO's agreement to source and conduct due diligence on the Tesdison technology including the ultimate licensing of that technology to Bitech and serve as a member of its board of directors, Bitech Mining issued to M CAO, through his company B & B and his wife DAO, an aggregate of 35,000,000 shares of Bitech Mining common stock.

13. In late 2020, M CAO and C CAO (the "CAOS") approached Bitech Mining Corporation with a potential business opportunity. M CAO offered to negotiate an agreement with his brother C CAO and his company SUPERGREEN to license the use of an allegedly groundbreaking technology that C CAO recently patented.

14. The CAOS operate SUPERGREEN, which markets green, energy-efficient power sources. C CAO is the holder of US Patent No. 10,547,179 B2 for a "high efficient electric power generation and charging system" that Defendants commonly refer to as the "Tesdison technology." SUPERGREEN also markets the Tesdison technology.

15. The Defendants promote the Tesdison technology with several remarkable claims. Defendants claim that the Tesdison technology uses a modular battery powered generation to produce 40% more energy than the battery capacity. Defendants also claim that

there is no discharge time with perpetual energy being delivered 24/7. Defendants further claim that the battery operates completely off-grid with no utility connection required. Defendants market the Tesdison technology as a green, energy-efficient power source consistent with SUPERGREEN's business purpose.

16. Defendants proposed to Bitech Mining a transaction where Bitech Mining could obtain a license to the Tesdison technology, while Defendants would obtain shares of Bitech Mining and various monetary incentives.

17. On January 15, 2021, Bitech Mining, SUPERGREEN, and C CAO, entered into a Patent and Technology License Agreement ("License Agreement") where SUPERGREEN and C CAO granted BITECH a license to the Tesdison technology.

18. Per the License Agreement, Bitech Mining was to issue SUPERGREEN 8,000,000 restricted common shares of Bitech Mining upon signing and 2,000,000 restricted common shares within 12 months of signing the License Agreement, an aggregate of 10,000,000 shares of common stock which were issued by Bitech Mining. Additionally, Bitech Mining was to pay SUPERGREEN $25,000 within 12 months of signing the License Agreement.

19. Per the License Agreement, SUPERGREEN and C CAO agreed to certain licensing provisions. Specifically, SUPERGREEN and C CAO agreed that Plaintiff's license would be exclusive throughout the cryptocurrency mining industry.

20. Per the License Agreement, SUPERGREEN and C CAO agreed that the Tesdison technology would be fully compliant with the International Organization for Standardization (ISO) and other applicable standards by December 2022.

21. After entering the License Agreement, the CAOS began requesting Bitech Mining to take various actions under the guise of preparing the Tesdison technology for commercialization. The CAOS assured Bitech Mining that they could assist it with utilizing and commercializing this technology. Specifically, the CAOS requested that Bitech Mining retain them as consultants and that the CAOS be compensated with a monthly salary and with additional stock compensation.

22. Due to the CAOS' representations, Bitech Mining retained and increased the CAOS' salaries so they could serve as consultants to prepare BITECH for the commercialization of the Tesdison technology. BITECH eventually compensated them with a monthly salary of $6,000 for M CAO and $3,500 for C CAO in addition to the previously agreed to stock compensation. The CAOS instructed Bitech Mining and BITECH to provide their stock compensation to SUPERGREEN, B & B Investment Holding, LLC (an entity controlled by M CAO), and Linh Dao (M CAO's wife).

23. On March 27, 2022, Bitech Mining, SUPREGREEN, and C CAO entered into an Amendment to the License Agreement permitting Bitech Mining to sublicense the Tesdison technology and restructuring the shares conferred to Defendants in anticipation of BITECH's acquisition of Bitech Mining.

24. In their roles as consultants to BITECH, M CAO who was a member of BITECH's board of directors, requested BITECH company credit card and debit card . BITECH issued the company cards to M CAO with the expectation that he would provide an accounting or expense approval before incurring expenses or withdrawing funds. As such the CAOS were able to withdraw money directly from a BITECH's company account several times despite BITECH's demands to cease this unapproved practice.

25. In compliance with the License Agreement, BITECH transferred Defendants BITECH shares and made payments of money.

26. On October 25, 2021, Bitech Mining, SUPERGREEN, and C CAO entered into an Amendment to the License Agreement extending the Bitech Mining's license to a perpetual license.

27. To further assist Defendants with the development of the Tesdison technology, Plaintiff purchased a high end Ethereum mining ridge and additional expensive batteries. Plaintiff also hired a national expert in battery field, a technician, and a Chief Technology Officer to work closely with Defendants to assist in developing and commercializing the Tesdison technology. The CAOS used these additional resources provided by Plaintiff to assist M CAO in the filing of a patent application for a technology using confusingly similar

technology to the Tesdison technology under Provisional Patent Application No. 63/353,455. M CAO would later market himself and his two sons as inventors of the technology.

28. After entering the License Agreement and while the CAOS' were on BITECH's payroll, Defendants continued to seek licensing for the Tesdison technology from other entities in the cryptocurrency mining industry that were not associated with Bitech Mining. M CAO attempted to include his sons in the licensing negotiations and agreements with third parties, further demonstrating the self-serving nature of these actions. Defendants sought to divert corporate opportunities to themselves and their sons and away from Plaintiff by soliciting licensing agreements with other companies not affiliated with Plaintiff.

29. On information and belief, Defendants solicited companies in the cryptocurrency industry that were not affiliated with Plaintiff to license the Tesdison technology and then would demand for Plaintiff to pay referral fees for these business deals that only drew corporate opportunities away from Plaintiff.

30. Eventually, BITECH began to doubt that the Tesdison technology could be commercialized. Despite Bitech Mining and BITECH's significant investment in the technology, Defendants had not made any noticeable progress on their efforts to produce a commercially viable product using the technology, or so much as develop a commercially viable prototype for a product using the technology. Further, C CAO and SUPERGREEN were not able to provide the blueprint of the Tesdison system despite several requests from BITECH in effort to commercialize the technology.

31. In late 2022, the Defendants attempted to show Plaintiff the technology, however, at this time it was clear that the technology did not exist and at the very least was nowhere close to becoming ready for commercialization. Indeed, the Tesdison battery could not generate power on its own. Plaintiff discovered that the Tesdison battery that Defendants showed to Plaintiff was in turn powered by another set of batteries at the bottom of the system that Defendants attempted to conceal from Plaintiff. This was especially concerning because Defendants always claimed that the Tesdison battery technology operates completely off-grid

due to its innovation of the combination of flywheel and battery and controller without requiring a utility connection.

32. After Plaintiff caught Defendants attempting to conceal the true state of the Tesdison technology's functionality and readiness for commercialization, Plaintiff became suspicious that Defendants technology did not live up to its claims and that Defendants never intended to develop a commercially viable system based on the Tesdison technology.

33. Plaintiff began to investigate its suspicions and discovered that M CAO took money from Plaintiff's corporate funds in excess of $172,000. This was especially stunning to Plaintiff, because the CAOS never requested prior approval for the cash withdrawals or expenses, which were obviously related to personal expenses. As such, this money taken from Plaintiff's corporate funds was necessarily taken for Defendants own individual benefit.

34. On information and belief, Defendants never intended to develop the Tesdison technology and instead used the promotional materials relating to the Tesdison technology, the Tesdison patent, and other false representations with the intent of attempting to induce as many companies to agree to license the technology as possible.

35. On information and belief, after Defendants granted Plaintiff a license of the Tesdison technology, their intent was to embezzle as much corporate funds as possible from the licensee under the false guise of preparing the licensee for the commercialization of the Tesdison technology. In reality, Defendants are, and were at all times relevant, knowledgeable that the Tesdison technology would never be functional.

36. Defendants obtained significant corporate funds from BITECH. In salary alone, Defendants obtained substantial salaries from Plaintiff. Defendants also took other significant funds from BITECH's corporate accounts in amounts that cannot currently be fully ascertained.

37. Resulting from Defendants' unlawful scheme they together obtained 231,784,870 shares of BITECH. As of the filing of this complaint, SUPERGREEN holds 51,507,749 BITECH common shares, B & B Investment Holding LLC holds 128,769,372 BITECH common shares, and DAO holds 51,507,749 BITECH common shares.

38. Had the CAOS never represented to Bitech Mining and BITECH, that they could license Plaintiff the Tesdison technology and subsequently develop this technology to produce a commercially viable product, the Defendants never would have obtained any shares of Bitech Mining or BITECH and never would have been paid any salary.

39. On December 6, 2022, Plaintiff held a special meeting of the Board of Directors and voted to terminate M CAO and remove him as an authorized signatory for Plaintiff. Plaintiff also voted to form a special litigation committee to take action against the Defendants' misconduct on advice of counsel.

40. On December 15, 2022, M CAO resigned from BITECH's board of directors.

41. On December 28, 2022, Plaintiff terminated C CAO from BITECH.

42. As a result of Defendants wrongdoing, BITECH suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, loss of reputation and goodwill, and additional damages as available under the law.

## ALTER EGO AND CONSPIRACY ALLEGATIONS

43. At all relevant times here, Defendants SUPERGREEN and B & B and other unknown entities were the alter egos of the CAOS and DAO. There exists and has at all times relevant existed a unity of interest and ownership between the CAOS and DAO and SUPERGREEN and B & B such that any separateness between them has ceased to exist in that the CAOS and DAO completely controlled, dominated, managed, and operated SUPERGREEN and B & B to suit their convenience.

44. Specifically, at all times relevant, the CAOS and DAO (1) controlled the business and affairs of SUPERGREEN and B & B including any and all of their affiliates; (2) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets for his own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; and (4) used the corporate entities as mere shells, instrumentalities or conduits for himself and/or his individual businesses.

45. Defendants diverted money from BITECH for their own personal benefit, demonstrating that they did the same for their own companies.

46. The CAOS and DAO hold ownership, officer, or other roles with SUPERGREEN and B & B.

47. Adherence to the fiction of separate and corporate existence would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize a judgment in their favor.

48. The CAOS, DAO, SUPERGREEN, and B & B engaged in a conspiracy or conduct with the intent of depriving BITECH of considerable funds and obtaining a significant portion of BITECH's shares and each engaged in substantial acts in furtherance of this intent. Defendants are knowledgeable of the other Defendants' fraudulent conduct and worked to substantially assist Defendants to commit fraudulent and other wrongful conduct to convert BITECH corporate funds for their own personal benefit.

## FIRST CLAIM

### (Fraud – Concealment Against All Defendants)

49. Plaintiff realleges paragraphs 1-48 in this causes of action, as if fully set forth herein.

50. Defendants were licensors of their Tesdison technology to Plaintiff. Defendants each worked closely with Plaintiff under the guise of readying Plaintiff for the commercialization of the Tesdison technology. C CAO and SUPERGREEN were signers to the License Agreement. The CAOS were consultants to Plaintiff who received monetary compensation for their services. M CAO, was at times, a Director of Plaintiff. Defendants were, at times, shareholders of Plaintiff. M CAO possessed corporate cards for Plaintiff.

51. Defendants intentionally failed to disclose to Plaintiff the following:
   a. that the Tesdison technology was significantly behind the timeline that the Defendants produced in context of the License Agreement or would never be able to be commercialized;
   b. that M CAO overstated his expertise in the cryptocurrency mining and blockchain industry
   c. that the Defendants had no knowledge or capability of preparing the Tesdison

       technology to be commercialized;

    d. that Defendants never intended to develop the Tesdison technology to a point where it would become commercialized or functional;

    e. that Defendants utilized misleading prototypes with the intent of falsely representing to Plaintiff that the Tesdison technology was functional or close to being functional;

    f. that Defendants were using Plaintiff's corporate funds for Defendants' individual enrichment; and

    g. that Defendants were still actively soliciting licenses for the Tesdison technology from third parties not affiliated with Plaintiff.

52. Plaintiff did not know of the concealed facts that Defendants failed to disclose.

53. Defendants intended to deceive Plaintiff by concealing these facts. Specifically, the concealment of these facts played a significant role in Defendants' scheme to obtain shares of Plaintiff, monetary compensation, and corporate cards that they used to further convert Plaintiff's corporate funds for their personal benefit.

54. Had the omitted information been disclosed, Plaintiff reasonably would have behaved differently. Namely, Plaintiff would have never entered into the License Agreement, Plaintiff would have never done business with the CAOS, and Plaintiff would have never conferred shares or monetary compensation to the Defendants.

55. Plaintiff was harmed. Plaintiff suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, and loss of reputation and goodwill.

56. Defendants' concealment was a substantial factor in causing Plaintiff's harm.

## SECOND CLAIM

### (Breach of Contract Against All Defendants)

57. Plaintiff realleges paragraphs 1-48 in this causes of action, as if fully set forth herein.

58. On January 15, 2021, Plaintiff, SUPERGREEN, and C CAO, entered into a Patent and Technology License Agreement ("License Agreement") where SUPERGREEN AND C CAO granted Plaintiff a license to the Tesdison technology.

59. Per the License Agreement, Plaintiff was to provide SUPERGREEN with 8,000,000 restricted common shares of Plaintiff upon signing and 2,000,000 restrict common shares within 12 months of signing the License Agreement. Additionally, Plaintiff was to pay SUPERGREEN $25,000 within 12 months of signing the License Agreement.

60. Per the License Agreement, SUPERGREEN and C CAO agreed that the Tesdison technology would be fully complaint with the International Organization for Standardization (ISO) and other applicable standards by December 2022.

61. Per the License Agreement, Defendants agreed to certain exclusive licensing provisions. Specifically, Defendants agreed that Plaintiff's license would be exclusive in the cryptocurrency mining industry.

62. Defendants breached multiple provisions of the License Agreement.

63. Defendants failed to prepare the Tesdison technology for commercialization in accordance with the License Agreement.

64. Defendants solicited licensing for the Tesdison technology from other entities not affiliated with Plaintiff.

65. Plaintiff performed all or substantially all of the essential things that the contract required them to do or was excused from doing those things.

66. Resulting from Defendants' breaches, Plaintiff's suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, and loss of reputation and goodwill.

### THIRD CLAIM

**(Breach of Fiduciary Duty - Duty of Good Faith Against All Defendants)**

67. Plaintiff realleges paragraphs 1-48 in this causes of action, as if fully set forth herein.

68. Defendants were fiduciaries to Plaintiff. C CAO and SUPERGREEN were signers to the License Agreement. The CAOS were consultants to Plaintiff who received

monetary compensation for their services. M CAO, was at times, a Director of Plaintiff. Defendants were, at times, shareholders of Plaintiff. M CAO possessed corporate cards for Plaintiff.

69. Defendants failed to act as reasonably careful fiduciaries would have acted under the same or similar circumstances.

70. Defendants take reasonable efforts to develop the Tesdison technology.

71. Defendants knew and failed to disclose to Plaintiff that the Tesdison technology was significantly behind the timeline that the Defendants produced in context of the License Agreement or would never be able to be commercialized.

72. Defendants knew and failed to disclose that they did not possess the knowledge or capability of preparing the Tesdison technology to be commercialized.

73. Defendants utilized misleading prototypes with the intent of falsely representing to Plaintiff that the Tesdison technology was functional or close to being functional.

74. Defendants solicited licensing for the Tesdison technology from other entities not affiliated with Plaintiff.

75. Defendants used Plaintiff's corporate funds for Defendants' individual enrichment.

76. Defendants caused, coerced, and encouraged Plaintiff to incur corporate expenses for purposes that Defendants' knew were not in Plaintiff's best interest.

77. Resulting from Defendants' breaches, Plaintiff suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, and loss of reputation and goodwill.

78. Defendants' breaches were a substantial factor in causing Plaintiff' harm.

## FOURTH CLAIM

### (Breach of Fiduciary Duty - Duty of Undivided Loyalty Against All Defendants)

79. Plaintiff reallege paragraphs 1-48 in this causes of action, as if fully set forth herein.

80. Defendants were fiduciaries to Plaintiff. C CAO and SUPERGREEN were

12

signers to the License Agreement. The CAOS were consultants to Plaintiff who received monetary compensation for their services. M CAO, was at times, a Director of Plaintiff. Defendants were, at times, shareholders of Plaintiff. M CAO possessed corporate cards for Plaintiff.

81. Defendants knowingly acted against Plaintiff' interests in connection with their:
   a. failure to disclose that the Tesdison technology was significantly behind the timeline that the Defendants produced in context of the License Agreement or would never be able to be commercialized ;
   b. use of misleading prototypes with the intent of falsely representing to Plaintiff that the Tesdison technology was functional or close to being functional;
   c. failure to disclose that they had no intent of developing the Tesdison technology to a point where it would become commercialized or functional;
   d. incurring of corporate expenses for purposes that Defendants' knew were not in Plaintiff's best interest;
   e. use Plaintiff's corporate funds for Defendants' individual enrichment; and
   f. actively soliciting of licenses for the Tesdison technology from third parties not affiliated with Plaintiff.

82. Plaintiff did not give informed consent to Defendants' actions.

83. Defendants obtained individualized benefits due to their wrongful conduct towards Plaintiff. Some of these benefits included Defendants accrual of Plaintiff's shares and corporate funds on the basis of their wrongful, self-serving scheme and actions.

84. Resulting from Defendants' breaches, Plaintiff suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, and loss of reputation and goodwill.

85. Defendants' breaches were a substantial factor in causing Plaintiff' harm.

///

///

///

## FIFTH CLAIM

### (Conversion Against All Defendants)

86. Plaintiff reallege paragraphs 1-48 in this causes of action, as if fully set forth herein.

87. Defendants substantially interfered with Plaintiff' property by knowingly or intentionally using Plaintiff's corporate funds and Plaintiff's shares for Defendants' own personal benefit.

88. Plaintiff did not consent.

89. Resulting from Defendants' conversion, Plaintiff suffered loss of revenues, loss of corporate assets, loss of corporate opportunities, loss of reputation and goodwill, and the inability to account for all of its assets.

90. Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## SIXTH CLAIM

### (Violation of California Penal Code §496 Against All Defendants)

91. Plaintiff realleges paragraphs 1-48 above, as if fully set forth herein.

92. California Penal Code section 496 does not state a criminal conviction under section 496(a) is required for a private plaintiff to recover treble damages under section 496(c). "Instead, § 496(c) permits '[a]ny person' who 'has been injured by a violation of subdivision (a) or (b)' to 'bring any action' to recover treble damages." "A violation of §496(a) or (b) would occur when the subject engages in that described conduct." (Bell, 212 Cal.App.4th at 1045.)

93. Defendants unlawfully converted Plaintiff's corporate funds and Plaintiff's shares, for their own personal benefit.

94. Upon Plaintiff's requests for return of their corporate funds and Plaintiff's shares, Defendants refused to return the monies and shares and continue to do so.

95. Defendants acted and continue to act with the substantial agreement, advice, assistance and encouragement of each other, and based on such agreements, advice,

assistance, and encouragement, each has acted and continues to act as moral support for the actions of the other, both on their own, and on behalf of each other.

96. As a result of the violation of California Penal Code §496 by Defendants, and aiding and abetting the violation of the same, as described above, Plaintiff has suffered treble damages in an amount of at least $100 million, three times the amount of actual damages suffered according to proof at trial.

97. Plaintiff therefore requests judgment against Defendants in an amount of damages according to proof at trial, including treble damages of three times the amount of actual damages, along with interest at the statutory rate, pursuant to California Civil Code §§ 3287, 3288 and/or 3289. Plaintiff will request treble damages of at least $100 million based on a number three times the amount of actual damages suffered according to proof at trial.

## **PUNITIVE DAMAGES**

98. Defendants willfully and maliciously defrauded Plaintiff of its corporate funds and shares. The conduct of Defendants was intentional and committed willfully, maliciously, with fraud, oppression, or ill will and in conscious disregard of Plaintiff's rights, and constitutes clear and convincing evidence of despicable, outrageous, oppressive, and malicious conduct pursuant to California Code of Civil Procedure section 3294. Plaintiff is entitled to punitive and exemplary damages against Defendants, in an amount as the jury may find necessary for the sake of example of punishing Defendants for their unlawful conduct in an amount sufficient to deter Defendants from engaging in similar conduct in the future.

///
///
///

# **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff pray for judgement against Defendants, and each of them as follows:

1. For provisional relief ordering the Defendants not to transfer their shares until the conclusion of this litigation;
2. For actual damages in an amount according to proof at trial;
3. For tort damages in an amount according to proof at trial;
4. For Defendants to return of all Plaintiff's shares in their control to Plaintiff;
5. For punitive damages in an amount subject to proof at trial;
6. For treble damages of no less than $100,000,000 and other damages under California Penal Code section 496 in an amount subject to proof at trial;
7. For a constructive trust to be imposed against Defendants and their assets, with respect to the property taken from Plaintiff and damages caused to Plaintiff, pursuant to California Civil Code § 2224;
8. For pre-judgment and post-judgment interest at the statutory rate;
9. For attorneys' fees and costs; and
10. For such other and further relief as the Court deems just and proper.

Dated: February 2, 2023              **KIMURA LONDON & WHITE LLP**

By:   _/s/ Darrell P. White_____
Darrell P. White, Esq.
Michelle E. Soon, Esq.
Maxx E. Sharp, Esq.
Attorney for Plaintiffs,
BITECH TECHNOLOGIES CORPORATION